**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-303 (RDM)** |
| **BRETT ALAN ROTELLA, a/k/a Brett Ostrander,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brett Alan Rotella, also known as Brett Ostrander, to 60 months' incarceration—near the top of the Guidelines range—three years of supervised release, $2,000 in restitution, and a $360 special assessment.

### I.    INTRODUCTION

The defendant, Brett Rotella, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim

Rotella, a former bouncer from North Carolina, used his considerable size and strength on January 6 to lead rioters in pursuit of the police as they retreated into the Capitol building. After becoming enraged by the deployment of tear gas by police officers on the West Plaza, Rotella pushed a bike rack into an MPD officer, striking him in the foot. After that initial confrontation, Rotella consistently placed himself at the front of various mobs of rioters, moving forward every time the police were forced to retreat.

Rotella led rioters up the southwest stairs to the Inaugural Stage. Rotella was stopped at least twice on his way to the Inaugural Stage by police officers. Both times, Rotella instructed the rioters behind him to "hold!" and then advanced as soon as the police retreated. Rotella followed the police as they retreated from the Inaugural Stage into the Lower West Terrace Tunnel. In fact, Rotella was the first rioter into the Tunnel on January 6.

A police officer deployed pepper balls at Rotella in an attempt to stop his advance but Rotella simply turned his back to the officer and continued to march into the Tunnel. Rotella then stood and watched as another rioter shattered the glass on one of the locked doors in the Tunnel that separated the police from the rioters. Once the door was smashed, Rotella pulled open the door, advanced on the officers, and pushed forcefully against them, at times further leveraging his considerable size by pushing against the nearby doorframe.

After approximately ten minutes, Rotella was hit by OC spray and forced to leave the Tunnel. But Rotella did not stop fighting the police. For at least another 90 minutes, Rotella stayed on the Inaugural Stage. During this time, he: (1) attempted to organize group "heave-ho" pushes against the police; (2) fought his way through the dense crowd close to the police line to push

officers, the government has sought restitution based on a case-by-case evaluation.

against officers; (3) allowed another rioter to climb on his back to attack the police from an elevated position; and (4) helped to push a large orange ladder into the Tunnel at the police.

The government recommends that the Court sentence Rotella to 60 months of incarceration. A 60-month sentence reflects the seriousness of Rotella's conduct inside and around the Lower West Terrace Tunnel, his leading role in the events of January 6, and his lack of remorse for his crimes on that day.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. A large portion of Rotella's conduct occurred at the Lower West Terrace Tunnel. Therefore, the government also refers the Court to Trial Exhibit 004, which is a video chronology of the events at the Tunnel on January 6, 2021.

### B.    Rotella's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Rotella traveled from his home in North Carolina to Washington, D.C., with his wife and his wife's family. On the morning of January 6, 2021, Rotella attended the "Stop the Steal" rally near the Washington Monument and then marched with his wife and others to the West Front of the U.S. Capitol.

At approximately 2:23 p.m., Rotella and his wife stood near police barricades set up on the southwest side of the U.S. Capitol building. At about that time, rioters near Rotella began to pull away the bike racks that police had positioned on the perimeter of the restricted area to prevent ingress into that area. Police officers rushed over and tried to grab the bike racks back from the

rioters and deployed chemical irritant ("OC spray") on rioters who were grabbing the bike racks. Ultimately, the rioters successfully pulled at least two of the bike racks away from the police and into the crowd. While Rotella did not participate in pulling the bike racks away from the police, he stood by and watched as the rioters did so and as the police fought to keep the bike racks.



*Image 1: Still image from Trial Exhibit 201 at timestamp 00:34 showing Rotella watching as rioters pulled bike racks away from the police*

After rioters pulled the bike racks away, the police reestablished a line of officers in that location. Rotella was one of the first rioters to approach that police line. He held a flagpole that had two flags affixed to it. He stood near the bike racks and yelled with other rioters at the police, stating, for instance, "We back you! Why don't you back us?!" and "Stand for freedom!"



*Image 2: Still image from Trial Exhibit 305B showing Rotella standing near bike racks on the south side of the West Plaza*

At approximately 2:25 p.m., tear gas was deployed in the area near where Rotella was standing.[2] Rotella became enraged, walked up to a metal bike rack that stood in front of the police line, yelled out "What you fucking tear gas us?! I didn't do shit!" and forcefully pushed the bike rack in the direction of MPD Investigator Davon Todd.



*Image 3: Still image from Trial Exhibit 305B of Rotella standing defiantly in front of MPD Investigator Todd after pushing the bike rack down at him*

---

[2] It is not clear whether the tear gas was deployed by the police or by the rioters.

At trial, Investigator Todd testified that the bike rack struck him on the foot but did not cause lasting injury. As Investigator Todd picked up the bike rack, Rotella continued to scream, "Did I do anything to any of you?!" Investigator Todd then told him multiple times to "back up!" Rotella responded defiantly, "Or what?!"

Over the next five minutes, the mob near the southwest side of the U.S. Capitol swelled and began to press in on the bike racks and the police line. Rotella was at the front of the crowd. As the police began to slowly retreat toward the building, Rotella led the other rioters in advancing closer, at times giving verbal directions or making signs with his hands. For example, when the police began their retreat, Rotella was still behind the bike racks. As the police began to back up, Rotella pushed aside a bike rack in front of him and walked forward as the police retreated. The mob followed.



*Image 4: Still image from Trial Exhibit 307 showing Rotella moving bike racks in order to advance as the police retreated*

Over the next few minutes, Rotella continuously placed himself at the front of the mob and gave other rioters strategic directions as the police were forced to retreat further. For example, at times, he put his arms out to keep other rioters behind him as the police relocated.



*Image 5: Still image from Trial Exhibit 307 showing Rotella signaling to the rioters around him to stop and wait*

But when the police retreated, Rotella put his hands down and led the rioters in moving forward. *See* Trial Exhibit 206. Rotella led the rioters in pursuit of the police all the way to the southwest scaffolding. When the police retreated up the stairs under the scaffolding, Rotella led the rioters up the stairs. When Rotella and the rioters got to the top of the stairs, they encountered a few police officers who were trying to facilitate a safe retreat of all of the officers from the West Front. Rotella stopped at the top of the stairs, held his hand up in a fist and called out "halt!" to the rioters behind him. The rioters followed Rotella's directions and stopped behind him at a landing of the stairs.



*Image 6: Still image from Trial Exhibit 312 showing Rotella instructing other rioters to halt at a landing on the southwest stairs*

When the police at the top of the stairs moved right around the corner to retreat up another set of stairs, Rotella and the other rioters advanced, turning left toward the Inaugural Stage where a few officers had retreated. At the edge of the Inaugural Stage, Rotella was stopped again by police officers. As he stood at the front of a crowd of rioters, more tear gas was deployed in the area. Rotella and the rioters around him felt the effects of the tear gas but still did not turn around.



*Image 7: Still image from Trial Exhibit 209 at timestamp 00:06 showing Rotella confronting the police at the head of a group of rioters at the edge of the Inaugural Stage*

After several minutes, the officers who had stopped Rotella retreated again. This time, they withdrew into the Lower West Terrace Tunnel, a 10-foot-wide, slightly sloped, short hallway (approximately 15 feet long) that led to two sets of metal swinging doors inset with glass. Rotella led the group of rioters behind him in pursuit of the police toward the Tunnel.



*Image 8: Still image from Exhibit 314 showing Rotella at the front of a crowd of rioters as police officers retreat into the Lower West Terrace Tunnel*

At approximately 2:40 p.m., after watching police retreat into the Tunnel, Rotella ascended the short flight of stairs and began to make his way into the Tunnel. As he walked up the stairs, a United States Capitol Police officer deployed pepper balls (which contained chemical irritant) in Rotella's direction to try to stop his advance. Rotella  turned his back to the officer and marched backwards towards the Tunnel as officers shot pepper balls in his direction. In response to that advance, the police retreated behind the first set of double doors in the Tunnel and locked the doors.



*Image 9: Still image from Trial Exhibit 103 showing Rotella backing up the stairs as a police officer shoots pepper balls at him*

Rotella was the first rioter to enter the Tunnel. He stopped at the first set of double doors which had been locked by the police just seconds earlier. He then discussed with other rioters whether they should break the door to get in. *See* Trial Exhibit 211. Rotella told the crowd, "Wait!" (*Id.* at 00:01) and "We need to decide what to do next!" (*Id.* at 00:02). Another voice, possibly Rotella's, then said, "Should we break this shit?!" *Id.* at 00:06. Other rioters then called out, "Why not?! We paid for it!" *Id.* at 00:10. MPD Sergeant Paul Riley testified at trial that he saw Rotella "donkey kick" the door with the heel of his foot. *See* Trial Exhibit 004 at timestamp 2:30; Trial Exhibit 104A at 00:00 to 00:07.



*Image 10: Still image from Trial Exhibit 004 showing the time period
when Rotella struck the locked double doors inside the Tunnel.*

At approximately 2:41 p.m., another rioter[3] used a tool to shatter the glass of one of the

first set of doors. Other rioters then pulled that door open as Rotella watched. After other rioters

opened the door with the broken glass, Rotella reached around and pulled open the second door in

front of him. Rotella then walked through this first doorway toward the police line that was set up

immediately after the second set of doors in the Tunnel.

---

[3] Alan Jennings was charged in case number 24-CR-203 (RBW) for using a pair of emergency medical shears to finally break open the locked door. Jennings pled guilty to civil disorder, in violation of 18 U.S.C. § 231(a)(3), and misdemeanor destruction of government property, in violation of 18 U.S.C. § 1361, and was sentenced to 12 months' incarceration.



*Image 11: Still image from Trial Exhibit 104A showing Rotella opening one of the locked doors to access the police line in the Tunnel*

For the next approximately ten minutes, Rotella pushed and fought the police inside the Tunnel. For example, at approximately 2:43 p.m., Rotella turned his back to the police line, used his hand to bolster himself against the frame of the second set of doors, and used his weight and size to push against a shield being held by MPD Sergeant Phuson Nguyen.



*Image 12: Still image from Trial Exhibit 316 showing Rotella using the door frame to help him to push forcefully against MPD Sergeant Nguyen's shield*

Sergeant Nguyen and another MPD Sergeant, Sergeant Bogner, pleaded with Rotella to

"stop!" and told him "we cannot let you in!" Trial Exhibit 316 beginning at timestamp 1:10. Rotella ignored their orders and continued to push against the police. Rotella then changed the position of his body so that he was no longer pushing with his back and stated to Sergeant Nguyen that he was concerned about his wife who was standing next to him in the Tunnel. A minute or so later, Rotella's wife moved away from the police line, but Rotella continued to push and fight the police.

At one point, police in the Tunnel used their batons to try to get the rioters to move back. Rotella responded by screaming at the police, "you want to hit me?! I'll fuck you up, motherfucker!" Trial Exhibit 217 at timestamp at 2:15. At about this time, another MPD officer in the Tunnel, Officer Spooner, fell to the ground immediately in front of Rotella and could not get back up for several minutes. As he testified at trial, Officer Spooner was extremely frightened during this time and believed he would be trampled by the rioters.

At about 2:55 p.m., Rotella finally stopped pushing and fighting with officers in the Tunnel and left the Tunnel—but only after being sprayed in the face with OC spray. With his eyes clenched shut (and his wife in tow), Rotella felt his way back out of the Tunnel and onto the Inaugural Stage.



*Image 13: Still image from Trial Exhibit 218 at timestamp 3:52 showing Rotella leaving the Tunnel with his eyes clenched shut*

Rotella then fought the police on the Inaugural Stage for at least another ninety minutes after he left the Tunnel. At approximately 4:00 p.m., Rotella joined a huge crowd of rioters that pressed into a police line under the archway that framed the exterior of the Tunnel. *See* Trial exhibit 219A. In other instances, Rotella led the crowd to work together to push in concert against the police line. At one point, Rotella held up his hand and rhythmically counted up to three to signal to the rioters on the stage to begin pushing together toward the police line. He repeated this coordinated direction several times.



*Image 14: Still image from Trial Exhibit 221A at timestamp 4:36 showing Rotella holding his index finger up to the crowd as he counted 1-2-3 to organize a group push against the police*

Rotella then pushed his way through the crowd closer to the police. He then allowed another rioter[4] to climb on his shoulders and attack the police. He also helped to push a large

---

[4] This rioter was David Dempsey. Dempsey was charged in case number 21-CR-566 (RCL). He pleaded guilty to two counts of assaulting, resisting and impeding officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a) and (b). Judge Lamberth sentenced Dempsey to 240 months' incarceration.

orange ladder into the Tunnel against police officers.



*Image 14: Still image from Trial Exhibit 221A showing Rotella pushing a large orange ladder into the Tunnel toward police as another rioter (indicated with an arrow) climbed on his shoulders*

At approximately 5:05 p.m., the police were finally able to clear the Tunnel and begin clearing rioters from the Inaugural Stage. In total, Rotella was on restricted Capitol grounds for more than two hours.

## III.    THE CHARGES AND PLEA AGREEMENT

On May 22, 2024, a federal grand jury returned a superseding indictment charging Rotella with six counts:

- Count One: civil disorder, in violation of 18 U.S.C. § 231(a)(3);

- Counts Two and Three: assaulting, resisting or impeding officers, in violation of 18 U.S.C. § 111(a)(1);

- Count Four:  entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);

- Count Five: disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); and

- Count Six: impeding passage through a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(E).

On September 11, 2024, a jury convicted Rotella of all counts.

## IV.    STATUTORY PENALTIES

Rotella now faces sentencing on all six of the above counts.

Paragraphs 122-26, 132-35, 141-43, and 151-56 of the Presentence Report (PSR)[5] lay out the  maximum penalties on each count.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government largely agrees with U.S. Probation's Guidelines calculation as set out in the PSR. The government's individual count guidelines calculations, set forth below, match those assessed by Probation. However, the government disagrees with Probation's grouping analysis.

**Count One: 18 U.S.C. § 231(a)(3)—Obstructing Officers During a Civil Disorder**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." |
| | | Rotella made physical contact with Investigator Todd on the West Front when he forcefully pushed the bike rack at Investigator Todd that struck Investigator Todd on the foot. Rotella also made physical contact with police officers inside the Tunnel when he pushed against them, as charged in Count Three. |
| | | Physical contact need not be direct and encompasses indirect uses of force. *See, e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) |

---

[5] As of the filing of this memorandum, only the draft PSR, ECF No. 65, is available.

| | | |
|---|---|---|
| | | (specific offense characteristic properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. App'x 457 (5th Cir. 2007). Courts have held that the specific offense characteristic applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *See United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016). |
| *Cross reference* | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br><br>Rotella's conduct constitutes aggravated assault under §2A2.2 because he committed felonious (punishable by up to eight years' incarceration pursuant to 18 U.S.C. § 111(a)) assaults of Investigator Todd and the officers in the Tunnel. These felonious assaults also involved an intent to commit another felony aside from the assaults, namely, obstructing police officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Chapter 3 Adjustment (Official Victim) | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>The victims of Rotella's actions were MPD officers wearing police uniforms and identifiable as officers. Rotella's actions were also clearly motivated by their statuses as police officers. For example, Rotella's assault of Investigator Todd was retaliation for the police's use of tear gas while defending the Capitol from rioters. Similarly, Rotella's actions against the police in and around the Tunnel were attempts to get |

| | | into the building to disrupt the certification. He took those actions against the police because he knew the police were trying to stop him and other rioters from breaching the Capitol building and stopping the certification. |
|---|---|---|
| Total | 20 | |

**Count Two: 18 U.S.C. § 111(a)(1) —Assaulting, Resisting or Impeding Investigator Todd**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G § 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most appropriate guideline is § 2A2.2 (Aggravated Assault).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." <br><br> Investigator Todd testified that the bike rack that Rotella forcefully pushed at him struck him in the foot. Capitol security video of the incident depicted this incident and shows the bike rack striking and bouncing off of Investigator Todd's left foot. |
| *Cross reference* | See below | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." <br><br> The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1. <br><br> Rotella's conduct constitutes aggravated assault under §2A2.2 because he committed a felonious (punishable by up to eight years' incarceration pursuant to 18 U.S.C. § 111(a)) assault of Investigator Todd. This felonious assault also involved an intent to commit another felony aside from the assault, namely, obstructing police officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline. *See also United States v.* |

| | | |
|---|---|---|
| | | *Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where he acted "with intent to commit civil disorder under Section 231(a)(3)."). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault. |
| Chapter 3 Adjustment (Official Victim) | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." Investigator Todd was a member of the Metropolitan Police Department. He was wearing his full uniform which identified him as a police officer. As discussed above, Rotella's actions in pushing the bike rack at Investigator Todd were motivated by his status as a police officer because they were acts in retaliation for the police's use of tear gas in defending the Capitol building from rioters. |
| Total | 20 | |

**Count Three: 18 U.S.C. §§ 111(a)(1) —Assaulting, Resisting or Impeding Officers in the Tunnel**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G § 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most appropriate guideline is § 2A2.2 (Aggravated Assault).

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." Rotella made direct physical contact with police officers and/or their shields when he pushed against them in the Tunnel. |

| Cross reference | See below | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br><br>Rotella's conduct constitutes aggravated assault under §2A2.2 because he committed a felonious (punishable by up to eight years' incarceration pursuant to 18 U.S.C. § 111(a)) assault of the officers in the Tunnel. This felonious assault also involved an intent to commit another felony aside from the assault, namely, obstructing police officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Chapter 3 Adjustment (Official Victim) | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>The officers against whom Rotella pushed were clearly identifiable as police—they wore full uniforms and/or riot gear. Rotella's actions in pushing against them were motivated by their status as police since he wanted to get into the Capitol building and the police were preventing him from doing so as part of their duty to defend the Capitol. |
| Total | 20 | |

**Count Four: 18 U.S.C. 1752(a)(1) —Entering and Remaining in a Restricted Building or Grounds**

| | | |
|---|---|---|
| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) |
| Specific Offense Characteristic (Restricted Grounds) | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| *Cross reference* | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." <br><br> Here, Rotella trespassed with the intent to obstruct law enforcement during a civil disorder, in violation of 18 U.S.C. § 231(a)(3) and with the intent to assault, resist, or impede officers, in violation of 18 U.S.C. § 111(a). <br><br> U.S.S.G. § 2X1.1(a): Apply "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> As described above, Rotella entered the restricted area of the Capitol to obstruct or impede law enforcement during a civil disorder and to assault, resist, or impede law enforcement. The substantive offense is thus Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and the base offense level and the specific offense characteristics for that offense should be applied. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Total | 14 | |

**Count Five: 18 U.S.C. § 1752(a)(2) —Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." *See* the analysis in Count One, above. |
| *Cross reference* | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." *See* the analysis in Count One, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Total | 14 | |

**Count Six: 40 U.S.C. § 5104(e)(2)(E) —Impeding Passage Through Capitol Grounds or Capitol Buildings.**

Because this offense is a Class B misdemeanor, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**Grouping**

While the PSR groups the counts into three groups, there should be four.

Under U.S.S.G. § 3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."

Group One consists of Counts One (Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)), because the victim of Count One includes all of the officers obstructed by Rotella, including MPD Investigator Todd, officers on the West Plaza, officers in the Tunnel (including MPD Sergeants Nguyen and Bogner), and officers on the Inaugural Stage. The highest offense level for this Group is 20.

The PSR groups Count Two with Count One because Investigator Todd was a victim for both counts. PSR ¶ 38. However, Count One's victims include additional officers beyond Investigator Todd. Therefore, the victims of Counts One and Two are not identical and belong in different groups.

Thus, Group Two consists of Count Two (the assault of Investigator Todd, in violation of 18 U.S.C. § 111(a)), because the victim of Count Two was Investigator Todd, and not the full group of officers impacted by Rotella's conduct for Count One. The highest offense level for this Group is 20.

Group Three consists of Count Three (the assault of MPD officers at the Tunnel, in violation of 18 U.S.C. § 111(a)), because the victim of Count Three was the line of MPD officers at the Tunnel, including officers (including MPD Sergeants Nguyen and Bogner). The highest offense level for this Group is 20.

Group Four consists of Counts Four and Five, charging violations of 18 U.S.C. §§ 1752(a)(1), and 1752(a)(2), because the victim of each of these counts is Congress, pursuant to U.S.S.G. § 3D1.2(b). The highest offense level for this Group is 14.

Pursuant to U.S.S.G. § 3D1.4(a), Group One has the highest offense level and therefore counts as one unit, and Groups Two and Three are equally serious and so count as one additional unit each, for a total of three units. Also, pursuant to § 3D1.4(b), Group Four is 6 levels less serious than Group One and therefore counts as one-half unit.

With three and one-half units, pursuant to U.S.S.G. § 3D1.4, four levels are added to the Group with the highest offense level (Group One, offense level 20). Accordingly, the total offense level should be 24, which when combined with the criminal history score of I, results in a Guidelines range of 51 to 63 months.

The Sentencing Guidelines for 2023 included a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Rotella used violence and credible threats of violence against the police on January 6, 2021. Specifically, Rotella used and threatened violence when he forcefully pushed the bike rack at MPD Investigator Todd on the West Plaza. He also used violence when he forcefully pushed against MPD officers—including MPD Sergeant Nguyen—inside the Tunnel. His use of violence on January 6, 2021 disqualifies him from receiving the reduction under § 4C1.1.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is also guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As discussed above, Rotella's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Rotella began his crusade to get into the building while on the West Plaza where he threw a bike rack down at an officer. From there, he assumed a front-lines role and directed the rioters' progress. As he approached the building, the mob closely behind him, Rotella repeatedly confronted officers. Nevertheless, he charted a path from the West Plaza, up the southwest stairs, and onto the Inaugural Stage, culminating in his entrance—the first rioter to do so—into the Lower West Terrace Tunnel. When confronted with a locked door, he consulted with other rioters, ultimately determining to break the door. Once another rioter was able to break the door, Rotella began to push and fight the police guarding the entrance to the U.S. Capitol inside the Tunnel.

Rotella remained at the Tunnel even after he was forced to leave, trying again to lead rioters in concerted efforts to defeat the police. The nature and circumstances of Rotella's offenses, including his persistent defiance of police and willingness to enlist the mob around him and usher their progress, were of the utmost seriousness, and fully support the government's recommended sentence of 60 months' incarceration—higher than the midpoint of the applicable guidelines range.

### B.    Rotella's History and Characteristics

Rotella is 35 years old. He holds an associate degree in engineering and holds an armed security license. He currently works as a security officer at Scores Gentlemen's Club and Steakhouse in Mooresville, North Carolina. Rotella reported to the PSR writer that he was abused as a child and his mother struggled financially. PSR ¶¶ 85–56. Rotella is now the father of three children, ages 1, 5, and 10. Rotella's crimes stand in stark contradiction to his education, work in security, and responsibility for supporting his family—all of which he disregarded when he stormed the Capitol and assaulted police officers on January 6, 2021.

While Rotella has no criminal history points, he does have a criminal past.  In 2009 he sold marijuana to a confidential source in Marion County, Florida and was charged with seven drug-related offenses. PSR ¶ 75. Rotella was ultimately convicted on three possession offenses and an adjudication of guilt was withheld on all other offenses. According to the PSR, Rotella was sentenced 6 months' custody and 4.5 years of probation on the withheld adjudications and 32 days' custody on the three convicted offenses. *Id.*

In 2014, Rotella was accused of and arrested for strangling his then-wife and mother of his first child. According to the PSR, the victim claimed Rotella came home drunk and assaulted her, including grabbing her face, punching her, strangling her, and throwing her on the ground. Police reported observing multiple scratches and bruises on the victim's neck. The case was dismissed as

nolle prosequi. However, the PSR reports that during his interview with Probation, Rotella claimed the victim struck him in the face and he grabbed her neck and held onto it to keep the victim back. Though the charges relating to this event were dropped, Rotella's statement acknowledges that he resorted to strangulation when faced with conflict.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rotella's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Rotella also weighs heavily in favor of a term of incarceration.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

As set out above, Rotella first encountered police officers and experienced police deterrent tactics while on the West Plaza of the U.S. Capitol. But these signs did not deter him from continuing forward. In fact, nothing deterred Rotella from continuing to fight the police in order to get into the U.S. Capitol on January 6—not the police officers' repeated attempts to stop his progress toward the building, not a set of locked doors, and not the horrific scene of violence inside the Tunnel. Through all of this, Rotella continued to fight. His crimes were not the product of a moment's emotion but spanned hours—plenty of time for him to reconsider and leave. But he didn't. Nor has he expressed any remorse for his criminal conduct, and any expressions of remorse at sentencing should be taken by this Court with a grain of salt.

Rotella's persistence in obstructing the police to get into the U.S. Capitol building on January 6 indicates he requires a sentence that will provide specific deterrence. A sentence of 60 months will accomplish that goal.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Gillespie*, 22-CR-60 (BAH). Gillespie fought the police at the Tunnel from approximately 4:12 p.m. to 4:16 p.m. He used two stolen police riot shields to fight the police and grabbed MPD Sergeant Riley (also a victim in this case). A jury convicted Gillespie of violations of 18 U.S.C. §§ 111(a), 231(a)(3) and two misdemeanors. Judge Howell sentenced Gillespie to 68 months' imprisonment. Gillespie's use of the riot shields against police and his false testimony at his trial justify a slightly higher sentence than in Rotella's case, but Rotella's multiple 111(a) convictions in two different locations, the fact that he was the first rioter to enter the Tunnel, and

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6 of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

his repeated attempts to organize the rioters to attack the police even after leaving the Tunnel support a sentence near Gillespie's, a sentence of 60 months.

*United States v. Gietzen*, 22-CR-116 (CJN). Gietzen also assaulted police officers on the West Plaza before moving up to the Lower West Terrace Tunnel. Gietzen pushed and pulled against officers and ignored commands to move back on the West Plaza. Later, still on the West Plaza, he shoved another officer and grabbed a third officer's gas mask. As the police retreated, Gietzen advanced, using a long pole to jab officers. Gietzen then went to the Lower West Terrace Tunnel where he pushed and obstructed officers for approximately twenty minutes. After January 6, Gietzen made statements to others celebrating his actions. A jury convicted Gietzen of violations of 18 U.S.C. §§ 231, 111(a)(1), 111(a)(1) and (b) and several misdemeanors following a jury trial. Judge Nichols sentenced him to 60 months' incarceration. Rotella should receive the same sentence. While there are certain aggravating factors present in Gietzen's case that are absent here—e.g. post-January 6 statements, and an assault with a deadly weapon—there are also uniquely aggravating factors here that were not present in Gietzen's case—e.g. Rotella's self-appointment as a shepherd of the mob on the West Front, status as the first rioter into the Lower West Terrace Tunnel, participation in the decision to smash the door open, and extended time (approximately 90 minutes) fighting police at the Tunnel.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But since Rotella was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Rotella engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses, if not a "cause in fact," the Court has discretion to apportion restitution and hold Rotella responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Rotella to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Rotella's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

into a guilty plea agreement, $2000 has consistently been the agreed-upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

Rotella's convictions under 18 U.S.C. §§ 231 and 111 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). His convictions under 18 U.S.C. § 1752 subject him to a maximum fine of $100,000. *See* 18 U.S.C. § 3571(b)(5). His convictions under 40 U.S.C. Section 5104 subject him to a maximum fine of $5,000. *See* 18 U.S.C. § 3571(b)(6). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months' incarceration, three years of supervised release, a $360 special assessment and $2,000 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
nathaniel.whitesel@usdoj.gov
(202) 252-7759